Donald E.  Watnick (DW 6019)
LAW OFFICES OF DONALD WATNICK
292 Madison Avenue, 17th Floor
New York, New York 10017
(212) 213-6886
*Attorneys for Plaintiff*
*Christian Augustin von Hassell*
*a/k/a Agostino von Hassell*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CHRISTIAN AUGUSTIN VON HASSELL a/k/a     :
AGOSTINO VON HASSELL,                     :
                                          :          07 Civ. 3477 (LAK)
                    Plaintiff,            :
        - against -                       :
                                          :          AFFIDAVIT
ALAIN SAINT-SAËNS and UNIVERSITY          :
PRESS  OF THE SOUTH, INC.,                :
                                          :
                    Defendants.           :
                                          :
------------------------------------------------------------ X

        CHRISTIAN AUGUSTIN VON HASSELL a/k/a AGOSTINO VON HASSELL, being

duly sworn, hereby states and attests as follows:

        1.      I am the Plaintiff in the above-entitled case, and am fully familiar with the facts set

forth herein.  I make this Affidavit in support of Plaintiff's application, pursuant to Fed. R. Civ. P.

55(b)(2) and Local Rule 55.2(b) of this Court, for an order of damages based upon the default of

defendants University Press of the South, Inc. ("UNPS")  and Alain Saint-Saens ("Saint-Saens"),

in accordance with this Affidavit and the facts set forth herein.

**Background**

        2.      In this action, Plaintiff seeks damages against defendants Saint-Saens and UNPS

arising from a written book publishing agreement (the "Publishing Agreement"), dated as of May

8, 2006, between Plaintiff, as author, and UNPS, as publisher, with respect to Plaintiff's book,

<u>Military High Life: Elegant Food, Histories and Recipes</u> (the "Book").  Saint-Saens is the

President of UNPS and he signed the Publishing Agreement.

3.      As set forth in Amended Complaint (the "Complaint"), defendants have failed to

meet their contractual and other obligations to promote, market and sell the Book, and have

thereby caused me damage in excess of $350,000, including my out-of-pocket costs of

$233,289.44 and lost royalties of $196,593.75 to $261,000, plus additional damages for attorneys'

fees and costs in this action.  (A copy of the Amended Complaint (the "Complaint") herein, to

which neither defendant responded, is annexed hereto as Exhibit A; a copy of the Publishing

Agreement is annexed thereto as Exhibit B.)[1] Defendants also fraudulently induced me to sign the

Publishing Agreement in the first place and entrust them to be the publisher of the Book.  In

addition, defendants failed to comply with their obligations to provide information about sales for

the Book on a regular basis, and to work with me to promote and sell the Book.

4.      In particular, after I paid substantial costs for writing, producing and printing the

Book, which has been featured in The Wall Street Journal and on the Food Network, defendants

made essentially no efforts to sell, market or promote the Book.  Prior to my signing the

Agreement, defendants stated that they were capable of selling, marketing and promoting the

Book, that UNPS was a full service publishing firm, and that they would make appropriate efforts

to do so.  In fact, UNPS was not a full service publishing firm and did not even have fully

functioning telephone lines or a web-based sales system.  (Complaint, ¶ 33.)

5.      I understand that the Agreement required defendants to sell, market and promote

the Book.  (<u>See</u> Agreement at ¶¶ II and VI, annexed as Exh. B to Exh. A (Complaint).)  As set

forth below, I invested significant sums in reliance on defendants' doing so in accordance with

---

[1] My attorney, Donald E. Watnick, previously filed with the Court Declarations setting forth the circumstances of each
defendant's default, and those declarations are being re-submitted with this application for damages.

their agreements and representations, including for production, printing, shipping, promotion, photography, editorial services and fees to UNPS. However, defendants undertook virtually no efforts to do so, and refused to work with me to sell and promote the Book. At all times, I fully performed the Publishing Agreement.

6.      Significantly, when I pressed defendants to meet their obligations under the Publishing Agreement to sell, market and promote the Book, they told me that they would not do so if I did not pay them an additional $30,000 – which amount was not called for by the Publishing Agreement. (See Complaint, ¶ 36.) Defendants also have refused to communicate with me directly, including informing my representatives that they would not read my emails. (Id., ¶ 35.)

7.      Due to defendants having possession of virtually all of the 5,000 copies of the Book that were printed (at my expense), and having world-wide distribution and licensing rights to the Book pursuant to the Publishing Agreement, I am unable to sell the Book, or issue new editions of it, without them. (See Agreement at ¶¶ II, annexed as Exh. B to Exh. A (Complaint).) Further, the Publishing Agreement has a duration of more than five years. (Id. at ¶ XI.) This means that, as a result of defendants' breaches, there will be no sales through the year 2011. In sum, defendants' breaches have denied me the benefit of the substantial amounts of time, effort and money that I invested in the Book, the ability to re-print or publish new editions of the Book, and the ability to start related businesses for which I intended to use the Book to launch.

8.      The specific claims in the Complaint are for breach of contract and breach of the duty of fair dealing against UNPS and for fraud and detrimental reliance against both defendants. (Exh. A.)

**The Book**

9.      As set forth in the Complaint, the Book is photo book about food in the military, and was the first illustrated history of international fine military dining, reaching from the present back to ancient Egyptian times.   In 2006, my contributors -- Herm Dillon, Lisa M. Pellegrino and Teresa Caiado Ramirez -- and I completed work on and published the Book.  (A copy of the Book is being submitted with this Affidavit and is labeled Exhibit Y.)

10.     I have worked on this book since about 1992 when I started collecting recipes, historical materials and documents that relate to the overall subject of military food.  The most intensive period of work was from 2001 to 2006 when the book was actually written by me and the other contributors, photography was arranged, additional archival research was conducted and the final book was edited and assembled.   In addition, I spent extensive time on trying to find an appropriate publisher for this book and then promoting the Book in 2006, 2007 and again in 2008 to a wider audience.  I believe that I devoted about 1,500 hours to work on this book, considering all of the related activities over the years.

11.     My work on the Book was aimed not only at publishing and promoting the Book. The Book was part of my long-term plan to develop a platform and brand from which I could then publish additional food history books, participate in media productions about food and dining and the military and promote related ventures.  These types of opportunities require a track-record of success with an initial project, and I expected that the Book would provide such a demonstrated success from which I could then launch these related ventures.

My Background

12.     I am an experienced photojournalist, author and investigator.  I have written

extensively on military and war history for publications such as *The Marine Corps Gazette, Die Zeit (Germany), Naval Proceedings, Defense News*, and *The Navy Times*, among others. I am the author of *Warriors: The United States Marine Corps* and *Strike Force: U.S. Marine Corps Special Operations*, as well as *In Honor of America* and, together with Herm Dillon, *West Point: The Bicentennial Book*. In November 2006, St. Martin's Press in New York released *Alliance of Enemies: The Untold Story of the Secret American and German Collaboration to End World War II*, which I coauthored with Sigrid McRae.

13.     In addition to my work as an author, I am the president of The Repton Group LLC ("Repton"), an international investigative firm based in New York City.[2]

**Publication of the Book**

14.     As noted, the Book was published in 2006. Since then, the Book has received significant publicity and exposure including reviews in the Wall Street Journal on September 30/October 1, 2006 and in the magazine Gastronomica in the fall of 2007. There also have been numerous print stories about the Book, such as in the Peoria (Ill.) Journal Star, Northern Virginia Daily and The Atlanta Constitution. (Copies of complete list of the print media publications about the Book and certain of these reviews and stories are annexed as Exh. B.)

15.     Due to my own efforts to publicize the Book, the Book and I were featured in a program that aired on the Food Network in January 2008, and I have given several lectures to food and historical groups.

16.     Despite the strong market potential for the Book, defendants undertook virtually no efforts to promote and sell the Book, and, due to defendants' breaches, the sales of the Book

---

[2] In connection with my work for Repton, I have contributed sections to the Encyclopedia of Law Enforcement (Sage Publications, 2005). I have co-authored (with W. McDonald and M.R. Haberfeld) a chapter in Comparative Policing The Struggle for Democratization (Sage Publications 2008), titled *International Cooperation in Policing: A Partial Answer to the Query?* In 2007, I coauthored and presented (with M.R. Haberfeld) an article titled *Proper Proactive Training to Terrorist Presence and Operations in Friendly Urban Environments*, at the NATO Counter-Terrorism Conference in Washington, D.C. subsequently published by the NATO Science for Peace and Security Program.

have been insubstantial, consisting of – it is believed - less than 300 copies sold to date by

defendants. (Exh. A., Complaint, ¶¶ 31-36.)  Defendants have never supplied current and detailed

sales data, or allowed me to inspect any of its sales data.[3]  (Id.)  Defendants' principal sales efforts

for the Book have consisted of including the book on the website of the UNPS, which is not well

known. (Id.)

17.     While I engaged professionals to promote the Book and devoted time to doing so

myself, defendants refused to work with any of us in promoting and selling the Book and largely

would not even communicate with me at all.  Defendants further obstructed efforts to promote and

sell the Book by refusing to do so unless I agreed to other terms and conditions outside of the

Publishing Agreement, including paying them an additional $30,000 beyond what was provided

for in the Publishing Agreement.  (See Exh. A., Complaint, ¶35.)  This forced me to engage an

attorney, prior to instituting this lawsuit, to address these issues with defendants and their attorney.

Damages

18.     Accordingly, the damages sustained include both the substantial amounts that I

invested in the Book, the loss of royalties that would have been generated by the Book had

defendants performed in accordance with the Agreement and their obligations, and the damages

that I have incurred due to defendants' not providing sales reports, not communicating and other

failures to perform, including attorneys' fees incurred to attempt to redress defendants' breaches.

19.     As set forth below, the damages sustained for development and expenses of the

Book includes costs paid to contributors, editorial, photographic, art and design services, printing,

shipping, promotion, travel, attorneys' fees and other miscellaneous costs, during the period from

2002 to 2008, and total $233,289.44.  These costs are summarized in the chart annexed hereto as

---

[3] I understand that the Publishing Agreement required defendants to provide royalty reports and sales information pertaining to the Book, neither of which was provided to me.  (See Exh. B to Exh. A hereto, at ¶¶10.7-10.8.)

Exhibit C. I prepared the chart based upon my review of records that I created and maintained in the regular course of business as to expenses relating to the Book.[4]

20.    Specifically, the out-of-pocket costs incurred for the Book and lost as a direct consequence of defendants' breaches and wrongful actions include the following:

a.    Payments made to Lisa Pellegrino for editorial services (research, editing and writing) and marketing and promoting the Book during the period from February 2003 to December 2007 totaling $11,225.00 for her time and $169.38 for disbursements related to the Book, for a total of $11,394.38. Ms. Pellegrino is an independent consultant who provides various research and administrative services to Repton and me. I have annexed as Exhibit D hereto a copy of an affidavit executed by Ms. Pellegrino, in which she sets forth the amount of time spent on the Book, the amount she charged for such work and related disbursements, and that she was fully paid for these amounts, which totaled $11,225.00 for her time and $169.38 for disbursements related to the book, for a total of $11,394.38. Ms. Pellegrino has annexed to her affidavit a summary of the charges she billed relating to the Book and based upon copies of the invoices that she prepared and issued in connection with services for the Book.

b.    Payments made to Kristin Hoelen for photographic services relating to the Book during the years 2003 to 2005 in the total amount of $3,900.00. I have annexed hereto as Exhibit E copies of Form 1099s provided to Ms. Hoelen for 2003 and 2005 in the total amount of $3,400, and a transmittal letter that I prepared in 2004

---

[4] I paid certain of these expenses through Repton, a limited liability company of which I am the President and to which I am entitled to all of the revenues (with the exception of certain origination fees that Repton pays to several persons) and responsible for all of the expenses.

to send Ms. Hoelen an additional payment for $500. I maintained a copy of the foregoing transmittal letter for the purpose of recording that such a payment was made to Ms. Hoelen, which payment also is reflected in a ledger that I maintained for the year 2004 of payments made in connection with the Book. (A copy of the foregoing ledger for 2004 is annexed hereto as Exh. F.)

c.   Payments made to Deborah Fisher during 2004 for copy editing for the Book, totaling $800. I am attaching a copy of a proposal that Ms. Fisher made to me, in the amount of $800, and a transmittal letter for the first payment in the amount of $400 to Ms. Fisher. I maintained a copy of the proposal (for $800) to have a record as to the full amount that I paid to Ms. Fisher, and a copy of the transmittal letter to evidence the first payment (for $400) made to Ms. Fisher. (Copies of the foregoing proposal and transmittal letter are annexed hereto as Exh. G.) These payments totaling $800 to Ms. Fisher also are reflected in the ledger that I maintained for the year 2004 for payments in connection with the Book. (See Exh. F.)

d.   Payments made to the Kulesh Design Group for art, design and photographic services, including design and set up for shoots for photos, and promotional work. These payments were for work performed during the period from 2003 to 2007, and the payments to them for the Book totaled $13,151.16. I am attaching hereto as Exh. H a list of payments made to Kulesh in connection with the Book that I have prepared by reviewing my records for such payments. I also am including in Exh. H Form 1099s that I issued to Kulesh for the years 2002 to 2006, which total $18,008.29 and include the amounts in the foregoing list, as well as some payments made for different matters.

e. Payments to Keith Crossley for art and photography design, including assisting with set up of photography shoots and designing and arranging photography shoots. These payments were for work performed during 2005 and total $3,700. I am attaching hereto as Exh. I a Form 1099 for these payments.

f. Shipping costs for the Book from Long Beach, California (where the copies of the Book were received after the printing in Asia) to New Orleans, where defendants' offices are located. Under the Agreement at ¶¶ IV-V (see Exh. B to Complaint, which is Exh. A hereto), I agreed to pay such costs. These costs totaled $7,130.17. As set forth in the summary sheet annexed hereto as Exh. J, these charges consist of charges of $511.30 and $654.62 respectively for inland and handling charges to Logistics Worldwide ("Logistics"), $4,000 for shipping to Logistics and $1,964.25 for shipping to FedEx. Also included in Exh. J are canceled checks to Logistics in the amounts of $654.62 and $4,000, a FedEx charge to my credit card in the amount of $1,964.25 and invoices from Logistics Worldwide corresponding to the foregoing charges that I have maintained to record payments of these amounts.

g. Legal fees in connection with the Book stemming from defendants' breaches, including regarding copyright and contractual issues relating to the Agreement, to Robert N. Solomon, Esq., in the amount of $14,420.50 for the period from November 2006 to September 2007. I have attached hereto as Exh. K a Declaration from Robert N. Solomon, Esq. summarizing the services that he performed relating to the Book and confirming his receipt of payment from me in the amount of $14,420.50. These services were performed due to UNPS' refusal to perform the Publishing Agreement, including its assertion, as noted in Paragraph

36 of the Complaint, that it would not perform if I did not pay UNPS an additional $30,000.

h.  Payments to Harry McMann during the years 2002 to 2007, totaling $16,141.71 for production work for the extensive photographs in the book, including purchasing of food, styling food and preparing food for the shots. I have annexed hereto in Exh. L Form 1099s showing payments to McMann during this period in the amount of $8,669.84. In addition, my ledger of payments for the year of 2002 (Exh. S) reflects payments that I made to McMann during the year 2002 totaling $7,744.87.

i.  Payments for printing the book and related marketing material totaling $27,430, which are reflected in three invoices that I received from Rainbow Graphics & Printing for a total of that amount, and which I maintained as a record of having made such payments. These invoices are annexed hereto as Exh. M.

j.  Payments made to Defendant UNPS in accordance with the Agreement for editing, publishing, and purchases of copies of the Book for promotional purposes, which totaled $3,430, as reflected in copies annexed hereto as Exh. N of a cancelled check in the amount of $2,500, a cancelled check for $680, and a transmittal letter for a check in the amount of $250 that I have maintained as a record of that payment.

k.  A payment in the amount of $7,500 to John Besh, a chef who wrote the introduction to the Book. I am attaching hereto as Exh. O a copy of his invoice, with my notation that it was paid by check.

l.  Payments to Cultural Communications ("Cultural") to promote the Book during 2006 to 2008, totaling $18,200, which are evidenced by invoices from Cultural that I maintained to record my payment of these amounts. These invoices are attached

hereto as Exh. P.  I made these payments to Cultural to promote the Book in reliance upon defendants fulfilling their obligations.

m.  Payments made to Leslie Jean-Bart for photography for the Book during the years 2002 to 2005, totaling $27,929.90.  These payments are evidenced by 1099 Forms that were issued to Mr. Bart, totaling $22,100 for the years 2005 and 2006, and invoices from Mr. Bart and my payment ledger for 2002, which I retained to evidence payments to him, that show payments in the amount of $5,829.90.  These 1099s, invoices and ledgers are annexed hereto as Exh. Q.

n.  Payments for film developing and scanning totaling $3,491.21 during the year 2005.  I have annexed hereto as Exh. R a summary of those payments, which is followed by receipts that I used to create the summary.

o.  Miscellaneous costs associated with the Book for 2002 totaling $52,460.91, including for payments to Ramirez, a contributor to the Book, and travel and other costs for persons working on the book (Crossley, Ramirez, McMann), hotel costs, film development and supplies. These expenses are listed in the annexed Exh. S, which was compiled based upon a ledger of expenses that I maintained for 2002, and a copy of that ledger is included in Exh. S.  I have excluded from this total those expenses that are referred to and incorporated elsewhere in this affidavit.

p.  Miscellaneous costs associated with the Book for 2003 totaling $8,808.12, including for payments in the amount of $4,000 to Ramirez for work on the book and payments for printing of photos for the Book.  These expenses are listed in the annexed Exh. T, which was compiled based upon receipts that I maintained for 2003, and a copy of that ledger is included in Exh. T.  I have excluded from this

total those expenses that are referred to and incorporated elsewhere in this affidavit.

q.   Miscellaneous costs associated with the Book for 2004 totaling $1,591.02, including for copies and promotional expenses. These expenses are listed in the annexed Exh. U, which was compiled based upon records that I maintained, and receipts for photo prints for which I paid $921.59 and are included in Exh. U.

r.   Miscellaneous costs associated with the Book for 2005 totaling $2,287.96, including for supplies and for food purchased in connection with the Book, which are listed in a ledger as annexed Exh. V, which I maintained for the year 2005.

s.   Miscellaneous costs associated with the Book for 2006 totaling $6,267.21, including for payments to Ramirez for work on the Book, legal fees, promotional prints, shipping and postage. These expenses are listed in the annexed Exh. W, which was compiled based upon a ledger of expenses and receipts that I maintained for 2006, and a copy of that ledger and those receipts are included in Exh. W.

t.   Miscellaneous costs associated with the Book for 2007 totaling $3,255.19, including for payments to for a mailing list for promoting the Book in Europe, and travel expenses. Receipts for these expenses are contained in the annexed Exh. X.

21.   In sum, as specifically set forth in Paragraph 20 and each of its sub-parts, the total amount of out-of-pocket costs that I incurred for the production (including writing, photography and related services), legal fees, marketing and promotion was $233,289.44. Due to defendants' failure to sell, promote and market the Book, and their repudiation of the Publishing Agreement, I have lost the entirety of this amount.

22.   If not for defendants' breaches as detailed in the Complaint, I would have recouped the total amount of my out-of-pocket expenses for the Book, and I would have received

royalties from both the initial printing and subsequent printings and editions of the Book. Under the Publishing Agreement, I was entitled to a 50% royalty on the net revenues from the sales of the Book during the five-year terms of the Publishing Agreement. (See, Publishing Agreement at ¶ X, which is Exh. B to Exh. A.) As further set forth in the accompanying Affidavit of Alexander Hoyt, I signed a five-year Publishing Agreement with UNPS because I expected that our extensive marketing and promotional activities (as evidenced by the amount paid to a marketing agency (see ¶ 20(l)) would result in extensive interest in the Book. As a result, I expected to sell in full the first 5,000 copies of the Book that were printed. I also expected that our efforts would generate interest for printing additional copies and the publication of additional editions of the Book. Such additional printings and/or new additions would have generated sales of an additional at least 10,000 copies.

23.    As the Book sold for $34.95 per copy, even after allowing for a 25% fee to the distributor or seller of the Book, my 50% royalty for each copy sold would have been $13.10, or $65,331 for each 5,000 copies sold. Presuming that we would have achieved 15,000 in sales during the five-year term of the Agreement, my royalties would have been $196,593.75. An additional sales of 5,000 copies, which I believe could have been reasonably achieved due to my marketing and promotional efforts and high profile among military groups, would have generated at least an additional $65,000 in royalties to me. Such royalties are consistent with the representations that defendants made to me before I signed the Publishing Agreement that my royalties would be at least $150,000. (Complaint, ¶ 25.)

24.    In view of defendants' breaches, I am unable to sell the Book at all. Under the Publishing Agreement, defendants have the exclusive right to distribute, license and sell the Book for five plus years. In short, I am unable to sell the Book on my own, and without defendants'

cooperation, which has been nonexistent, I am unable to generate sales for the Book through defendants.

25.    The lack of sales activity not only has generated out-of-pocket losses and lost royalties, but also has prevented me from undertaking other profitable ventures in the areas of food and military history.

26.    No prior application for the relief requested herein has been made.

WHEREFORE, Plaintiff CHRISTIAN AUGUSTIN VON HASSELL a/k/a

AGOSTINO VON HASSELL respectfully requests that this Court enter a Default Judgment

against Defendants University Press of the South, Inc. and Alain Saint-Saens, the amount of

$233,289.44, plus royalties totaling $261,000, or at least $196,573.75, plus costs and attorneys'

fees in amount to be determined by the Court, and such other relief as this Court deems just and

proper.

CHRISTIAN AUGUSTIN VON HASSELL
a/k/a AGOSTINO VON HASSELL

Sworn to this 1st
day of April, 2008

Notary Public

LINDA KRUMMENACKER
Notary Public, State of New York
No. 01KR4674747
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires December 31, 2010

15

**EXHIBIT A**

Donald E. Watnick (DW 6019)
LAW OFFICES OF DONALD WATNICK
292 Madison Avenue, 17th Floor
New York, New York 10017
(212) 213-6886

*Attorneys for Plaintiff*
Christian Augustin von Hassell
*a/k/a Agostino von Hassell*

Doc # 3

DOCKET

SENT TO CHAMBERS
FOR REVIEW

MAY 1 6 2007

U.S.D.C.S.D.N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

CHRISTIAN AUGUSTIN VON HASSELL a/k/a :
AGOSTINO VON HASSELL,                      :

                    Plaintiff,                   :

    - against -                                 :

                             :

ALAIN SAINT-SAËNS and UNIVERSITY  :
PRESS OF THE SOUTH, INC.,                   :

                    Defendants.            :

------------------------------------------------------------X

07 Civ. 3477 (LAK)

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, Christian Augustin von Hassell a/k/a Agostino von Hassell, by his undersigned

attorneys, Law Offices of Donald Watnick, for his Complaint against defendants Alain Saint-

Saëns and University Press of the South, Inc., hereby alleges and argues as follows:

## NATURE OF THE ACTION

1.     This is an action for breach of contract, breach of the duty of good faith and fair

dealing, fraud and detrimental reliance in relation to a book publishing agreement between

Plaintiff Christian Augustin von Hassell a/k/a Agostino von Hassell ("von Hassell" or

"Plaintiff") as the author and Defendants Alain Saint-Saëns ("Saint-Saëns") and University Press

of the South, Inc. ("University Press") as publisher.

## PARTIES

2.      Plaintiff von Hassell is domiciled in and is a citizen of the Commonwealth of Virginia, as well as a resident of the State of New York, with a residence located in New York County, and a principal place of business located at 399 Park Avenue, New York, New York. At all times, Plaintiff von Hassell conducted and participated in all or substantially all of the transactions and communications described herein from his office in the State of New York.

3.      Defendant University Press is a corporation organized under the laws of the State of Louisiana with its principal place of business located at 5500 Prytania Street, PMB 421, New Orleans, Louisiana, and is a citizen of the State of Louisiana.

4.      Defendant Saint-Saëns, upon information and belief, is the President of University Press, and is domiciled in and is a citizen of the State of Louisiana.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter based on diversity of citizenship, pursuant to 28 U.S.C. §1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000.

6.      At all relevant times, Defendants have conducted business in the State of New York, including through one or more interactive web-sites and in connection with the transactions, facts and circumstances set forth herein.

7.      Venue is appropriate in this District pursuant to 28 U.S.C. §1391 because a substantial part of the events and omissions giving rise to the claims herein occurred in this District.

8.      Pursuant to Fed.R.Civ.P. 38(b), Plaintiff hereby demands a jury trial of the claims asserted herein.



## FACTS COMMON TO ALL ALLEGATIONS

**Plaintiff is an Established Author on Military History**

9.    In this action, Plaintiff seeks to recover more than $350,000 in damages arising
from Defendants' failure to perform under a book publishing agreement and to keep legally
binding promises, and fraudulently inducing Plaintiff to execute a publishing agreement with
respect to Plaintiff's book, *Military High Life: Elegant Food, Histories and Recipes* (the
"Book"). (A copy of the cover of the Book is annexed as Exhibit A hereto.)

10.    As described in a 2006 review in *The Wall Street Journal*, the Book is a "coffee-
table volume" that is intended to be a tour of military kitchens and officers' messes over the
years, and "includes 141 beautiful color illustrations and 73 interesting recipes." von Hassell,
who was a captain in the U.S. Marine Corps, created and is the lead author of the Book.

11.    Plaintiff also has authored several other books about the U.S. Marine Corps and
the U.S. military, including *Warriors. The United States Marine Corps, Strike Force: Marine
Corps Special Operations; West Point: The Bicentennial Book;* and *In Honor of America.* He is
most recently co-author of the historical volume *Alliance of Enemies: The Untold Story of the
Secret American and German Collaboration to End World War II,* published by St. Martin's
Press.

12.    To develop and produce the Book, including fees for design, photography,
research, writing and editing, Plaintiff incurred costs of in or about $100,000. Plaintiff also
devoted hours of his own time to developing and writing the Book.

**The Publishing Agreement Between the Parties**

13.    By agreement dated May 8, 2006, Plaintiff and University Press executed a
Publishing Agreement, whereby Plaintiff granted University Press the exclusive world-wide

3

rights to publish and sell Plaintiff's book in the English language.  The parties thereafter executed an Addendum to the Publishing Agreement.  (A copy of the Publishing Agreement and Addendum thereto (collectively, the "Agreement") are annexed as Exhibit B hereto and fully incorporated herein.)

14.     The Agreement provides that University Press has "the sole and exclusive right to . . . print, publish and sell" the Book in the English language.  The Agreement further states that University Press "has the exclusive, unlimited right to license or permit others to publish, reproduce or provide the work in whole or in part," and that these rights include all forms of publication.

15.     Under the Agreement, University Press agreed to market and promote the Book and work with Plaintiff in "an equitable manner" to distribute the Book.

16.     The Agreement imposed start-up costs on Plaintiff for the publication and promotion of the Book.  Plaintiff agreed to pay to University Press $500, upon signing the Agreement, $2,000 for the costs of publication, and to pay all costs of printing of the Book.

17.     In executing the Agreement, University Press agreed to pay Plaintiff royalties equal to 50% of the net cash receipts from the sale of the Book.

18.     University Press also agreed to "provide in a timely manner sales reports to the [Plaintiff]," which sales reports were to be sent every two months and contain all relevant sales information, and to allow Plaintiff or "his representative to inspect sales records" for the Book.

19.     The Agreement stated that it would terminate five years after the publication date · if the Book was out of print and the publisher did not re-print it after a written demand by Plaintiff.

20.     Finally, the Agreement, which contained no choice-of-forum clause, is governed



by Louisiana law.

**Defendants' False Representations to the Plaintiff**

21.    Prior to Plaintiff's execution of the Agreement, University Press and Saint-Saëns falsely represented to Plaintiff that University Press was a full service publisher and book distributor, with the sales infrastructure and personnel to market, promote, sell and distribute books and a strong sales record on behalf of other authors. Defendants falsely represented the existence of, and Plaintiff relied on the existence of, University Press having a fully functioning on-line, web-based sales system, telephone systems to sell the Book and facilities and personnel to store and ship substantial inventory of the Book.

22.    Defendants also falsely represented to Plaintiff that, if he signed a publishing agreement with University Press, Defendants would utilize their affiliate and partner publishing house Presse Universitaire du Nouveau Monde in Europe to sell the Book.

23.    In addition, Defendants falsely represented that, if Plaintiff signed a publishing agreement with University Press, Defendants would have a full distribution plan in place, complete with advertising and promotional articles. Defendants also falsely represented that they had extensive experience is developing and implementing such promotional plans.

24.    Defendants falsely stated that such advertising and promotional plan would include listing the Book on "Amazon.com" and other web-sites, and that placing the Book with distributors and into book stores would be easy and a matter of course, in light of their alleged experience.

25.    Moreover, Defendants represented to Plaintiff that the Book would generate at least $150,000 in royalties to Plaintiff.

26.    After the Agreement was fully executed between Plaintiff and University Press,



Defendants continued to falsely represent and premise to Plaintiff that they were using and would use their best efforts to sell, market and promote the Book and that they were capable of and experienced in doing so.

27.    By virtue of its exclusive rights to sell, market, promote and distribute the Book over, at a minimum, a five year period, University Press had a duty to use its best efforts to perform its obligations under the Agreement.

**Plaintiff Has Fully Performed Under the Agreement**

28.    Plaintiff has fully performed the Agreement, including paying to University Press a total of $2,500, and delivering to University Press 5,000 copies of the Book after University Press approved the manuscript.

29.    Plaintiff paid approximately $42,000 to print 6,000 copies of the Book, including the 5,000 copies delivered to University Press.  Plaintiff paid an additional approximately $4,500 to ship copies of the Book to University Press.

30.    Plaintiff also has incurred more than $34,000 in costs associated with printing, developing, distributing, marketing and promoting the Book, as well as devoting extensive amounts of his own time to marketing and promoting the Book.

**Defendants Have Failed to Perform Under the Agreement and Have Otherwise Acted Improperly**

31.    University Press has failed to perform any of its obligations under the Agreement, including without limitation failing to promote, market, sell or distribute the Book, failing to work with Plaintiff to promote, market and sell the Book and failing to comply with its obligations to provide royalty reports and sales information to Plaintiff.

32.    In particular, Defendants have failed to comply with their obligations to make

efforts to distribute the Book on line, to distributors or to book-stores. Instead of promoting and marketing the Book to maximize sales, Defendants have undercut the Book by not coordinating with Plaintiff or promotional efforts, disregarding sales leads, issuing promotional material that was incomplete, illiterate or inaccurate and not timely shipping the Book.

33.   Potential distributors and purchasers of the Book, including book stores and universities, who have attempted to communicate with Defendants to order the Book, have been unable to do so because University Press did not have fully functioning telephone lines or a web-based sales system, or have found that Defendants did not respond to their communications.

34.   In further violation of the Agreement, University Press failed to pay royalties, and failed to issue royalty reports as provided for in the Agreement. University Press also refused to allow Plaintiff to inspect sales records for the Book, even though the Agreement entitled Plaintiff to inspect such records.

35.   Upon information and belief Defendants' actions in breach of the Agreement and their promises to Plaintiff have been purposeful and willful. Defendants have refused to communicate with Plaintiff directly, informed Plaintiff's representatives that Defendants will not read any emails sent by Plaintiff and, upon information and belief, deleted emails from Plaintiff about selling and promoting the Book, and have refused to engage in any sales, marketing or promotional activities for the Book.

36.   Moreover, when Plaintiff demanded that University Press fulfill its obligations under the Agreement, Defendants then insisted that Plaintiff first pay to Defendants as much as an additional $30,000 before they would comply with their binding and pre-existing obligations.

37.   As a result of University Press' breaches of the Agreement, and Defendants' fraudulent misrepresentations and failure to abide by its binding promises and commitments,

Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $200,000. Defendants' wrongful actions have caused further damage to Plaintiff because he has lost hundreds of thousands of dollars in profits that he would have made on the Book, his reputation as an author has been damaged, and he has been forced to incur substantial costs, including attorneys' fees. The amounts of these foregoing damages are no less than $350,000, and will be proven at trial.

### FIRST CAUSE OF ACTION
### (Breach of Contract against Defendant University Press)

38.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 to 37 with the same force and effect as if fully set forth and incorporated herein.

39.     As set forth herein, the Agreement was a valid and enforceable agreement between Plaintiff and University Press, which obligated University Press, *inter alia*, to sell, promote, market and distribute the Book, pay royalties to Plaintiff for sales of the Book, and provide to Plaintiff royalty reports and information about sales of the Book.

40.     At all times, Plaintiff fully performed the Agreement.

41.     University Press unlawfully breached the Agreement by failing and refusing to sell, promote, market and distribute Book, failing and refusing to pay royalties to Plaintiff for sales of the Book, failing and refusing to provide to Plaintiff royalty reports or sales information for the Book, and engaging in other conduct that unlawfully violated the Agreement.

42.     As a direct result of University Press' foregoing breaches, Plaintiff has been damaged in an amount to be determined at trial but equal to at least $200,000, plus lost profits for the Book in an amount to be determined at trial but equal to at least $150,000, damage to his reputation as an author, interest and costs, including attorneys' fees.

## SECOND CAUSE OF ACTION
### (Breach of Duty of Good Faith and Fair Dealing against Defendant University Press)

43.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 to 42 with

the same force and effect as if fully set forth and incorporated herein.

44.    As a matter of law, including without limitation under La. Civil Code Section

1983, and by virtue of having exclusive rights to sell, promote, market and distribute the Book,

the Agreement imposed upon University Press a duty of good faith and fair dealing, including

without limitation a duty to use best efforts to fulfill the terms and conditions of the Agreement,

and not engage in deceptive and dishonest acts.

45.    By failing and refusing to undertake appropriate efforts to sell, market, promote

and distribute the Book, and then insisting that it would not do so unless Plaintiff paid University

Press as much as $30,000 in excess of what it was due under the Agreement, University Press

unlawfully breached its duty of good faith and fair dealing.

46.    University Press further unlawfully breached its duty of good faith and fair

dealing by engaging in deceptive and dishonest acts, including refusing to communicate with

Plaintiff and his representatives and making false and inaccurate statements about its efforts to

sell, market, promote and distribute the Book.

47.    As a direct result of University Press' foregoing breaches, Plaintiff has been

damaged in an amount to be determined at trial but equal to at least $200,000, plus lost profits

for the Book in an amount to be determined at trial but equal to at least $150,000, damage to his

reputation as an author, interest and costs, including attorneys' fees.


## THIRD CAUSE OF ACTION
### (Fraud against both Defendants)

48.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 to 47 with

the same force and effect as if fully set forth and incorporated herein.

49.     In inducing plaintiff to execute the Agreement, Defendants represented that University Press was a full service publisher and book distributor, with the sales infrastructure and personnel to distribute books and a strong sales record on behalf of other authors.

50.     Defendants further represented that University Press' sales infrastructure included a fully functional on-line web-based sales system, both the telephone systems and personnel to sell and promote the Book, place and accept orders for the Book and distribute the Book, a facility from which inventory of the Book could be stored and distributed and European affiliates to sell and promote the Book.

51.     Defendants also represented that they would put in place a promotional plan for the Book and that they had the experience and track-record to readily develop and implement such a plan.

52.     Each of these representations by Defendants was material.

53.     Each of these representations by Defendants was false and misleading at the time that they were made.

54.     Defendants knowingly or recklessly made each of these representations with full knowledge that each of them was materially false and misleading when made to Plaintiff.

55.     Defendants made these false and misleading representations for the purpose of inducing Plaintiff to execute the Agreement and engage in business dealings with Defendants with respect to the Book.

56.     Plaintiff reasonably relied upon Defendants' false and misleading representations, in executing the Agreement and engaging in business dealings with Defendants, and would not have otherwise executed the Agreement and engaged in business dealings with Defendants.

10

57.    As a direct and proximate result of Defendants' false and misleading representations. Plaintiff has sustained damages in an amount to be proven at trial but equal to at least $200,000, plus lost profits for the Book in an amount equal to at least $150,000, damage to his reputation as an author. interest and costs, including attorneys' fees.

## FOURTH CAUSE OF ACTION
### (Detrimental Reliance against both Defendants)

58.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 to 57 with the same force and effect as if fully set forth and incorporated herein.

59.    In inducing Plaintiff to execute the Agreement. Defendants represented that University Press was a full service publisher and book distributor, with the sales infrastructure and personnel to distribute books and a strong sales record on behalf of other authors.

60.    Defendants further represented that University Press' sales infrastructure included a fully functional on-line web-based sales system, both the telephone systems and personnel to sell and promote the Book, place and accept orders for the Book and distribute the Book, a facility from which inventory of the Book could be stored and distributed and European affiliates to sell and promote the Book.

61.    Defendants also represented that they would put in place a promotional plan for the Book and that they had the experience and track-record to readily develop and implement such a plan.

62.    Each of these representations by Defendants was material.

63.    Each of these representations by Defendants was false and misleading at the time that they were made.

64.    Defendants knowingly or recklessly made each of these representations with full

knowledge that each of them was materially false and misleading when made to Plaintiff.

65.    Defendants made these false and misleading representations for the purpose of inducing Plaintiff to execute the Agreement and engage in business dealings with Defendants with respect to the Book.

66.    Plaintiff reasonably relied to his own detriment upon Defendants' false and misleading representations, in executing the Agreement and engaging in business dealings with Defendants, and would not have otherwise executed the Agreement and engaged in business dealings with Defendants.

67.    As a direct and proximate result of Defendants' false and misleading representations, upon which Plaintiff reasonably relied to his own detriment, Plaintiff has sustained damages in an amount to be proven at trial but equal to at least $200,000, plus lost profits for the Book in an amount equal to at least $150,000, damage to his reputation as an author, interest and costs, including attorneys' fees.

WHEREFORE, plaintiff Christian Augustin von Hassell a/k/a Agostino von Hassel respectfully requests judgment against defendants Alain Saint-Saens and University Press of the South, Inc. as follows:

(i)    Awarding money damages as set forth in each cause of action to compensate Plaintiff's losses in an amount to be proven at trial, but in no event less than $200,000.

(ii)    Awarding money damages as set forth in each cause of action for Plaintiff's lost profits in an amount to be proven at trial but in no event less than $150,000.

(iii)   Awarding money damages as set forth in each cause of action for

Plaintiff's loss of reputation in an amount to be proven at trial.

(iv)   Awarding costs and attorneys' fees and such other relief as this Court

deems just and equitable.

Dated: New York, New York
       May 15, 2007

LAW OFFICES OF DONALD WATNICK

By: _____
       Donald E. Watnick (DW 6019)
292 Madison Avenue – 17th Floor
New York, New York 10017
(212) 213-6886
*Attorneys for Plaintiff*
Christian Augustin von Hassell *a/k/a*
*Agostino von Hassell*

**Of Counsel:**
Edward F. Mauf (EM 6884)
BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, New York 10022
(212) 705-7000

13

# MILITARY HIGH LIFE
## *ELEGANT FOOD HISTORIES AND RECIPES*

*–Created by Agostino von Hassell*

*Herm Dillon & Leslie Jean-Bart*

*Introduction by John Besh*

# University Press of the South

## PUBLISHING AGREEMENT

Made this day of  May 8, 2006
By and between  Mr. Agostino von Hassel,
The Repton Group LLC, 26th Floor, New York, NY 10022
hereinafter referred to as the "author" (in the case of multiple authorship the word "author" is used collectively) and

### UNIVERSITY PRESS OF THE SOUTH, Inc.
5500, Prytania Steet, PMB 421
New Orleans, LA 70115  USA

hereinafter referred to as the "publisher."
The parties do agree as follows:

### I) Subject of the Publishing Agreement
1.1  The Subject of the Publishing Agreement is a work written by the author with the following title:

### Military High Life. Elegant Food Histories and Recipes.

hereinafter referred to as the "work." In the event either the publisher or the author wishes to retitle the work after this Publishing Agreement is signed, the new title shall be selected by consultation by the two parties.
1.2  The work shall appear in the Series:

### Cooking Culture Series.

In the event the work is assigned to a different series after this Publishing Agreement is signed, the new series shall be selected by consultation by the two parties.

### II) Rights to the Work
2.1  The author represents and warrants that he or she is the sole author and sole proprietor of all rights in and to the work; that the work is original and is not in the public domain; that it has not previously been published; that it does not violate or infringe any copyright, whether law or statutory, and contains nothing libelous or otherwise contrary to law; and that he or she has full power to enter into this Publishing Agreement.
2.2  The author shall indemnify and hold harmless the publisher and those to whom the publisher may license or grant rights hereunder and any seller of the work against any and all loses, damages, liability, and expenses, including attorney's fees, that the publisher may incur in the event any suit, claim, demand, action or proceeding is asserted or instituted against the work, the publisher, a licensee or grantee of the publisher or any seller of the work. If any suit, claim, demand, action, or proceeding is instituted, the publisher shall  promptly notify the author, who shall fully cooperate in the defense thereof.  The publisher may withhold payments of any and all royalties that might otherwise be due to the author under this or any other agreement between the parties until such time as the suit, claim, demand, action or proceeding is settled, withdrawn or finally resolved.  The publisher shall have the right to select counsel in all such suits, claims, demands, actions or proceedings.
2.3  The author hereby grants and assigns to the publisher the following rights in and to the work during the full terms of copyright and all renewals and extensions thereof, under the present or future laws of the United States, all other countries throughout the world and all international copyright conventions:
- The sole and exclusive right to: a) print, publish and sell the work or cause the same to be printed, published and sold in book form in English throughout the world; and b) all subsidiary rights to the work or any part thereof now existing or hereafter invented or created and the right to grant these rights to third parties, in English throughout the world without limitation.
The author specifically authorizes the publisher to copyright throughout the world in the name of the publisher the work or any revision or other edition thereof in English.  The publisher shall have the right to renew such copyrights if the publisher deems it advisable. However, the actual copyright shall be held by Agostino von Hassel and this shall so be reflected on the copyright page.
2.4  The publisher has the exclusive, unlimited right to license or to permit others to publish, reproduce or provide the work in whole or in part and in any and all forms, formats, systems and materials.  These rights shall include book club, paperback, translation, abridgement, adaptation, foreign editions, selections, motion picture, film, television, broadcasting, audio and video reproducing and recording systems, microfilm, large-type editions, Braille, and computer systems now known or hereafter invented.
2.5  The rights detailed in 2.4 shall be subject to the same royalty sharing agreement as spelled out in Section VIII.

### III) Permissions
If the author incorporates in the work any illustrative or copyrighted material, he or she shall procure, at his or her own expense, written permission to reprint the illustrations or copyrighted material in all editions of the work and for all uses of the work covered by this agreement. The author shall deliver such permissions to the publisher at the time of delivery of the final manuscript.

# PUBLISHING AGREEMENT

## IV) The Manuscript and Publication

4.1  On or before July 1st, 2006, the final manuscript of the work shall be delivered to the publisher either ready for reproduction by photo-offset ("camera-ready") or copy-edited and ready to be typeset, together with any permissions required pursuant to Clause III. The method of composition shall be agreed upon by the parties and shall be inserted in Clause 5.1 below. Publisher and author shall make every attempt to complete the pre-production of this work to allow shipment to the printer as early as possible to meet the fall 2006 holiday selling season. Publisher is aware that the work is at this time essentially camera ready yet still subject to revisions as required by the publisher.

If the author does not submit the manuscript by the above date, the author must ask the publisher for an extension to a date which shall be agreed upon by the parties. If the author does not submit the manuscript by the new date, the publisher may at its discretion grant the author a second extension or terminate this agreement by giving written notice, whereupon the author shall repay forthwith any and all monies advanced by the publisher. In the event the agreement is terminated, the publisher shall not be obligated to return to the author any monies paid to the publisher upon the signing of the agreement.

The author further agrees to supply promptly, at his or her own expense, all photographs, drawings, charts, indexes, or other material mutually agreed upon as necessary to the completion of the manuscript. If the author fails to do so, the publisher shall have the right to supply such material and charge the cost to the author.

4.2  In the event the author delivers the manuscript to the publisher by mail, the author shall send the manuscript by registered or certified mail or use a form of delivery which will ensure receipt by the publisher.

4.3  The author shall retain a duplicate copy of the manuscript which is delivered to the publisher.

4.4  The final manuscript shall be subject to approval by the publisher. If the manuscript is unacceptable, the author shall make revisions as requested by the publisher. In the event the revised manuscript is unacceptable, the publisher may terminate this Publishing Agreement by giving written notice, whereupon, the author shall repay forthwith any and all monies advanced by the publisher and may then submit the work to others.

It is understood and agreed that no duty shall devolve upon the publisher under this agreement until such time as the manuscript has been completed and edited to the satisfaction of the publisher. In no event shall the publisher be obligated to publish a work which in the judgment of its attorneys may lead to legal liability. In the event the author fails to make the work publishable within forty-five (45) days after notice from the publisher, the author shall repay forthwith all monies advanced by the publisher and the agreement shall be deemed terminated. In the event the agreement is terminated pursuant to this clause, the publisher shall not be obligated to return to the author any monies paid to the publisher upon signing.

4.5  The publisher shall arrange for copies of the work to be ready not later than six months after the author delivers the final manuscript. Any change in the date specified in Clause 4.1 for delivery of the final manuscript by the author shall delay the publication date. The publisher shall not be responsible for unforeseen delays resulting from strikes, Acts of God or other causes beyond its control or from the author's failure to deliver the final manuscript within the period of time mutually agreed upon.

## V) Production

5.1  Method of composition:   Camera-ready

5.2  If the author agrees to deliver a camera-ready manuscript, the technical quality and accuracy of the final manuscript shall conform to the guidelines supplied by the publisher. If the camera-ready manuscript delivered by the author contains typographical or format errors, the publisher shall return the manuscript to the author who shall make the necessary corrections at his or her own expense and return the manuscript to the publisher by a date mutually agreed upon.

5.3  If Clause 5.1 provides that the publisher will compose the manuscript, the author agrees to read and correct the proofs of the work and return them to the publisher within a period of time mutually agreed upon. Any author's alterations shall be charged to the author.

5.4  If the work contains illustrations or other artwork, the author shall pay for and deliver promptly any screened film or color separations, along with camera-ready mechanicals for positioning within the work. If the author fails to supply the artwork promptly or in the necessary form, the publisher shall have the right to supply it and charge the cost to the author.

5.5  If the final manuscript is camera-ready, the publisher shall begin directly to prepare the manuscript for printing. If the manuscript is to be composed by the publisher, the author and the publisher shall agree to the financial arrangements for composition before the publisher begins to prepare the manuscript for printing.

5.6  The publisher and the author agree that the manuscript will be printed in Hong-Kong and the cost of printing be covered by the author. Printed copies will be shipped by the printer to the publisher at author's cost.

5.7  When the work is first printed, the following free copies shall be made available by the publisher:

- 130 copies for the author.

5.7  The author may purchase additional copies of the work for personal use at the actual shipping and handling costs of the of the publisher. Such copies shall not be for resale unless expressly provided in this Publishing Agreement.

5.8  The work shall be sold at a price which shall be determined by the publisher.

5.10  The author shall receive 25 copies of any subsequent printings.

## VI) Promotion

The publisher shall promote the work in the style and manner which in its sole judgment is best suited to its sale. The publisher and any licensees or assigns of the publisher shall have the right to use the name, image, likeness and biography of the author in advertising and publicity. Publisher recognizes that the author will underwrite promotion activities as agreed upon jointly between the publisher and the author. Publisher shall work with the author in an equitable manner international distribution of the work abroad and in the English edition.

# PUBLISHING AGREEMENT

**VII) Revised Editions**
The publisher, after consultation with the author, shall have the sole discretion to decide that a revision of the work is desirable. At the publisher's request, the author agrees to deliver final copy for a revised edition satisfactory to the publisher in content and form by a date which shall be mutually agreed upon by the parties. If the author is unable to undertake the revision or is deceased, the publisher may arrange for the preparation of a revised edition. The compensation paid to the reviser (s) shall be charged against any sums accruing to the author on the sale of the revised edition. The publisher shall have the sole discretion to use the name of the author and/or reviser (s) on any revised edition of the work.

**VIII) Royalties**
10. 1 The author shall receive royalties on copies of the work sold by the publisher..
10. 2 The publisher shall pay a royalty of fifty percent (50%) of its net cash receipts from its sale of the work beginning with copy 1. Royalties shall be paid bi-annually in the third week of February and the third week of July for the prior six month sales period. In order to receive royalties, the author agrees to notify the publisher of any change of address.
10. 3 For copies of the work sold outside the United States through distributors, the publisher shall pay the author a royalty of fifty percent (50%) based on the amount credited to the publisher as a result of the sale.
10. 4 For all other copies of the work sold outside the United States and/or sold at discounts from the publisher's stated list price of more than fifty percent (50%), the author shall be paid a royalty of fifty percent (50%) of the net cash received.
10. 5 Royalties shall not be paid on sales made to the author, or on copies used for promotional purposes.
10. 6 The author shall be paid by check in U.S. dollars, unless otherwise specified in this Publishing Agreement.
10. 7 Publisher shall, upon request, allow the author or his representative to inspect sales records.
10.8. Publisher shall provide in a timely manner sales reports to the author. Such reports shall be prepared and sent ever two months and shall detail all relevant sales information (sales, returns etc.).

**IX) Subsidiary Rights**
11. 1 The publisher and the author shall share the exclusive right to all subsidiary rights to the work now existing or hereafter invented or created. The publisher alone may make arrangements with respect to these rights both on its own behalf and on behalf of the author. The net receipts from the sale or other disposition of subsidiary rights shall be divided equally between the publisher and the author.

**X) Overstock Copies**
If after four (4) years after publication date a substantial number of unsold copies remain in stock, the publisher shall have the right to clear its inventory of the work. The publisher shall notify the author and the author shall have the right to buy copies at a reduced price which shall be negotiated.

**XI) Termination**
If after five (5) years after publication date the work is out of print and within nine (9) months after written demand by the author the publisher does not bring out a new printing, this Publishing Agreement shall terminate. The publisher shall continue to share in the proceeds from the sale or other disposition of any subsidiary rights which have already been granted. The work shall be considered in print if it is on sale by the publisher or under license granted by the publisher, or if any contract or option for its publication, granted by the publisher, is outstanding.

**XII) Parties Bound**
This Publishing Agreement shall be binding upon the heirs, executors, administrators and assigns of the author and upon the successors and assigns of the publisher.

**XIII) Applicable Law**
This Publishing Agreement shall be governed by and interpreted in accordance with the laws of the State of Louisiana regardless of the place of its execution.
In witness whereof the parties hereto have executed this Publishing Agreement as of the day, month and year first above written.

University Press of the South, Inc.

Dr. ALAIN SAINT-SAËNS

Dr. AGOSTINO VON HASSELL

_____
Author

_____
Publisher

# ADDENDUM
# TO THE PUBLISHING AGREEMENT

**I) Contractual Fees**
A check in the amount of five hundred dollars ($500.00), payable to University Press of the South, Inc. and non-refundable shall be delivered to the publisher with the signed copy of this Publishing Agreement.

**II) Author's Contribution to the Cost of Publication**
2. 1 The author shall contribute the sum of two thousand dollars ($2,000.00), in ONE non-refundable payment, when paying the contractual fees.
2.2 The author shall pay for the cost of printing of the first edition and any other printings. If the first printing of the work is sold out within two years after publication date, the author shall produce a second printing at its own expense. Any printings after the second printing shall be produced at the sole discretion of the publisher.
2.3. If the author asks the publisher to prepare the manuscript camera-ready, he shall contribute the sum of fifteen hundred dollars ($1,500.00) in one non-refundable payment, along with a photocopy of the manuscript and a PC compatible diskette of the manuscript.

**III) Parties Bound**
This Addendum to the Publishing Agreement shall be binding upon the heirs, executors, administrators and assigns of the author and upon the successors and assigns of the publisher.

**IV) Applicable Law**
This Addendum to the Publishing Agreement shall be governed by and interpreted in accordance with the laws of the State of Louisiana regardless of the place of its execution.
In witness whereof the parties hereto have executed this Addendum to the Publishing Agreement as of the day, month and year indicated in the Publishing Agreement.

University Press of the South, Inc.

Dr. AGOSTINO VON HASSELL                         Dr. ALAIN SAINT-SAËNS

Author                                            Publisher

JS 44C/SDNY
REV. 12/2005

**JUDGE KAPLAN**

**CIVIL COVER SHEET**

07 CIV 3477

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

MAY 0 1 200?

| PLAINTIFFS Christian Augustin von Hassell a/k/a Agostino von Hassell | DEFENDANTS Alain Saint-Saëns<br>University Press of the South, Inc. |
|---|---|

ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Law Offices of Donald Walnick, 292 Madison Ave.,
17th Floor, New York, NY 10017 (212) 213-6886

ATTORNEYS (IF KNOWN)

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)

breach of contract, breach of the duty of good faith and fair dealing, fraud and detrimental reliance arising from defendants failures to perform under a book publishing agreement, to keep legally binding promises and fraudulently inducing execution of the publishing agreement

Has this or a similar case been previously filed in SDNY at any time? No [X] Yes? [ ]   Judge Previously Assigned

If yes, was this case Vol. [ ] Invol. [ ] Dismissed. No [ ] Yes [ ]  If yes, give date _____ & Case No. _____

*(PLACE AN [x] IN ONE BOX ONLY)*  **NATURE OF SUIT**

**ACTIONS UNDER STATUTES**

| TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|

**CONTRACT**

[ ] 110 INSURANCE
[ ] 120 MARINE
[ ] 130 MILLER ACT
[ ] 140 NEGOTIABLE INSTRUMENT
[ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
[ ] 151 MEDICARE ACT
[ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
[ ] 153 RECOVERY OF OVERPAYMENT OF VETERANS BENEFITS
[ ] 160 STOCKHOLDERS SUITS
[ ] 190 OTHER CONTRACT
[ ] 195 CONTRACT PRODUCT LIABILITY
[ ] 196 FRANCHISE

**PERSONAL INJURY**

[ ] 310 AIRPLANE
[ ] 315 AIRPLANE PRODUCT LIABILITY
[ ] 320 ASSAULT, LIBEL & SLANDER
[ ] 330 FEDERAL EMPLOYERS' LIABILITY
[ ] 340 MARINE
[ ] 345 MARINE PRODUCT LIABILITY
[ ] 350 MOTOR VEHICLE
[ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
[ ] 360 OTHER PERSONAL INJURY

**PERSONAL INJURY**

[ ] 362 PERSONAL INJURY - MED MALPRACTICE
[ ] 365 PERSONAL INJURY PRODUCT LIABILITY
[ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**

[X] 370 OTHER FRAUD
[ ] 371 TRUTH IN LENDING
[ ] 380 OTHER PERSONAL PROPERTY DAMAGE
[ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

[ ] 610 AGRICULTURE
[ ] 620 FOOD & DRUG
[ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
[ ] 630 LIQUOR LAWS
[ ] 640 RR & TRUCK
[ ] 650 AIRLINE REGS
[ ] 660 OCCUPATIONAL SAFETY/HEALTH
[ ] 690 OTHER

**LABOR**

[ ] 710 FAIR LABOR STANDARDS ACT
[ ] 720 LABOR/MGMT RELATIONS
[ ] 730 LABOR/MGMT REPORTING & DISCLOSURE ACT
[ ] 740 RAILWAY LABOR ACT
[ ] 790 OTHER LABOR LITIGATION
[ ] 791 EMPL RET INC SECURITY ACT

[ ] 422 APPEAL 28 USC 158
[ ] 423 WITHDRAWAL 28 USC 157

**PROPERTY RIGHTS**

[ ] 820 COPYRIGHTS
[ ] 830 PATENT
[ ] 840 TRADEMARK

**SOCIAL SECURITY**

[ ] 861 HIA (1395FF)
[ ] 862 BLACK LUNG (923)
[ ] 863 DIWC (405(g))
[ ] 863 DIWW (405(g))
[ ] 864 SSID TITLE XVI
[ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**

[ ] 870 TAXES
[ ] 871 IRS-THIRD PARTY 20 USC 7609

[ ] 400 STATE REAPPORTIONMENT
[ ] 410 ANTITRUST
[ ] 430 BANKS & BANKING
[ ] 450 COMMERCE/ICC RATES/ETC
[ ] 460 DEPORTATION
[ ] 470 RACKETEER INFLUENCED & CORRUPT ORGANIZATION ACT (RICO)
[ ] 480 CONSUMER CREDIT
[ ] 490 CABLE/SATELLITE TV
[ ] 810 SELECTIVE SERVICE
[ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE
[ ] 875 CUSTOMER CHALLENGE 12 USC 3410
[ ] 891 AGRICULTURE ACTS
[ ] 892 ECONOMIC STABILIZATION ACT
[ ] 893 ENVIRONMENTAL MATTERS
[ ] 894 ENERGY ALLOCATION ACT
[ ] 895 FREEDOM OF INFORMATION ACT
[ ] 900 APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE
[ ] 950 CONSTITUTIONALITY OF STATE STATUTES
[ ] 890 OTHER STATUTORY ACTIONS

**ACTIONS UNDER STATUTES**

**REAL PROPERTY**

[ ] 210 LAND CONDEMNATION
[ ] 220 FORECLOSURE
[ ] 230 RENT LEASE & EJECTMENT
[ ] 240 TORTS TO LAND
[ ] 245 TORT PRODUCT LIABILITY
[ ] 290 ALL OTHER REAL PROPERTY

**CIVIL RIGHTS**

[ ] 441 VOTING
[ ] 442 EMPLOYMENT
[ ] 443 HOUSING ACCOMMODATIONS
[ ] 444 WELFARE
[ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT
[ ] 446 AMERICANS WITH DISABILITIES -OTHER
[ ] 440 OTHER CIVIL RIGHTS

**PRISONER PETITIONS**

[ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255
[ ] 530 HABEAS CORPUS
[ ] 535 DEATH PENALTY
[ ] 540 MANDAMUS & OTHER
[ ] 550 CIVIL RIGHTS
[ ] 555 PRISON CONDITION

Check if demanded in complaint:

CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $ $350,000   OTHER _yes_

Check YES only if demanded in complaint
JURY DEMAND: [X] YES [ ] NO

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?
IF SO, STATE:

JUDGE _____   DOCKET NUMBER _____

NOTE: Please submit at the time of filing an explanation of why cases are deemed related.

*(SEE REVERSE)*

(PLACE AN x IN ONE BOX ONLY)    ORIGIN

[X] 1 Original Proceeding    [ ] 2a. Removed from State Court    [ ] 3 Remanded from Appellate Court    [ ] 4 Reinstated or Reopened    [ ] 5 Transferred from (Specify District)    [ ] 6 Multidistrict Litigation    [ ] 7 Appeal to District Judge from Magistrate Judge Judgment

[ ] 2b. Removed from State Court
AND at least one party is a pro se litigant

(PLACE AN x IN ONE BOX ONLY)    BASIS OF JURISDICTION    IF DIVERSITY, INDICATE CITIZENSHIP BELOW. (28 USC 1332, 1441)

[ ] 1 U.S. PLAINTIFF    [ ] 2 U.S. DEFENDANT    [ ] 3 FEDERAL QUESTION (U.S. NOT A PARTY)    [X] 4 DIVERSITY

CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [X]1 | [ ]1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ]3 | [ ]3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ]5 | [X]5 |
| CITIZEN OF ANOTHER STATE | [ ]2 | [X]2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ]4 | [ ]4 | FOREIGN NATION | [ ]6 | [ ]6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

Christian Augustin von Hassell a/k/a Agostino von Hassell
2 Sutton Place South
New York, NY 10022

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

University Press of the South, Inc.
5500 Prytania Street, PMB 421
New Orleans, Louisiana

Alain Saint-Saëns
5500 Prytania Street, PMB 421
New Orleans, Louisiana

DEFENDANT(S) ADDRESS UNKNOWN
    REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:    THIS ACTION SHOULD BE ASSIGNED TO:    [ ] WHITE PLAINS    [X] FOLEY SQUARE
(DO NOT check either box if this a PRISONER PETITION.)

DATE    SIGNATURE OF ATTORNEY OF RECORD    ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
[X] YES (DATE ADMITTED Mo. 04  Yr. 89  )
RECEIPT #    Donald E Witmer    Attorney Bar Code # 6019

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____    MAAS    _____ is so Designated.

J Michael McMahon, Clerk of Court by _____    Deputy Clerk, DATED _____

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

**EXHIBIT B**

**Military Food Book**

Copies of Book Reviews

CULTURAL COMMUNICATIONS

## MILITARY HIGH LIFE PUBLICITY
### Results reached an audience of 1 million+

**Magazines**

Air Force Magazine of Canada (Winter 2006 Issue)

Espirit de Corps (Canadian military magazine)

Gastronomica Magazine (Fall 2007)

Leatherneck Magazine (Winter 2007)

Military History Magazine (March 2007)

Veteran's Magazine (Winter Issue 2008)

**Newspapers, Newsletters & Wire Service Stories**

Atlanta Constitution (11.2.06)

Copley News Service (4.30.07)

Food History News (8.21.2007)

Northern Virginia Daily (Winter 2007)

Wall Street Journal (9.30.06)

Washington Post Express (1.25.07)

**Radio & Television**

Food Network "The Secret Life of Military Food" (1.7.08)

KOLE-AM Texas (Winter 2007)

**Author Lectures**
Culinary Historians of Boston (3.17.07)
Fraunces Tavern Museum (10.12.08)

PUBLIC RELATIONS & MARKETING

CULTURAL COMMUNICATIONS CORPORATION · 445 PARK AVENUE, NINTH FLOOR, PMB 250  NEW YORK, NEW YORK 10022
P 212.505.1253  F 917.591.7633  CONTACT@CULTURALCOMMUNICATIONS.INFO  WWW.CULTURALCOMMUNICATIONS.INFO



Case 1:05-cv-01073-LAK   Document 20   Filed 04/11/2008   Page 41 of 50



## Recipes

### S.O.S. (U.S. Air Force Recipe)

S.O.S. is a standard military breakfast item with roots built every ship, every unit having different recipes. The basics are, the sauce, smothered ground beef on toast. Far from basic, S.O.S. increasingly is featured on the breakfast menus of the finest hotels around the United States.

In 1985, during the civil war in Beirut, the United States Marines — then on the Jallal cut-shout zone and which the frequent shelling and street fire — were served a meat from home. Perfectly fried chicken was prepared aboard ship and thrown ashore, then served on top of bottled wine.

But taste may not be able to defeat technology. About the ways "food" we encountered were plans for the "Transdermal Nutrient-Delivery System" in early stages of development at NatticK. It is a patch, similar to painless used to quit smoking, that is equipped with a tiny computer that measures a soldier's food needs and then delivers nutrients through the skin. It's hard to put Tabasco on that



Left, the crew of the U.S. military must have produced hundreds of combine mammals during World War II, giving ambiance for harried cooks that had to supply meals for almost 12 million men and women in U.S. uniform. Every conceivable aspect of food preparation was covered — including how to use dehydrated food, and how to butcher and properly cook lamb aboard ship.

---

**Ingredients:**
1 pound ground beef
1/4 cup flour
2 cup milk
3-4 drops Tabasco Sauce
Salt and pepper to taste
White bread, toasted

**Instructions:**
1. Brown and chop ground beef. Remove ground beef with slotted spoon, and drain on a paper towel.

2. Sprinkle flour into fat remaining in pan to make a roux.

3. Cook for a few minutes over low heat.

4. Add milk a little at a time while stirring.

5. Add Tabasco Sauce.

6. Cook until thick and bubbling.

7. Add ground beef, salt and pepper to taste.

8. Serve over white bread toast "shingles."

## COOKING DEHYDRATED FOODS



---

### Hannah Davis Baked Apple Crumb

This is another recipe associated with George Washington and adapted from Fraunces Tavern.

**Ingredients:**

For the filling:
2 pounds tart apples, peeled, cored and sliced 1/4 inch thick
1/2 cup sugar
1 teaspoon cinnamon
1/2 teaspoon nutmeg
1/2 teaspoon ground cloves

For the topping:
1/2 cup flour
4 tablespoons sugar
3 tablespoons butter
1 teaspoon vanilla extract
Confectioners' sugar for garnish

**Instructions:**

1. To make the filling, combine the apples, sugar, cinnamon, nutmeg and cloves in a large bowl.

2. Stir to coat the apples.

3. Spoon the mixture into an 8 or 9 inch pie plate and set aside.

4. Preheat oven to 350 degrees F.

5. To make the topping, combine flour, sugar, butter and vanilla in a medium-size bowl.

6. Work mixture between fingers until crumbling, then drop crumbs on top of apple filling.

7. Bake for one hour, or until topping is golden.

8. Allow it to cool slightly, sprinkle with confectioners' sugar and serve.

---

### Loviel Lobster Salad

I owel Lobster Salad General Thomas Jonathan "Stonewall" Jackson, Confederate leader in early days of war at Manassas Junction on August 29, 1862. His troops then made off with fresh lobster and other victuals, such as barrels of superb cigars. Simply prepared in the field with fresh lettuce, this became famous dish from the War between the States. The dish was served with good wine. Rhine wine, even though the soldiers were half-starved and had been marching. One lieutenant described this "apple raid."

### Loviel Lobster Salad

In August 1862, Stonewall Jackson's men marched miles in 48 hours, arriving at Manassas Junction, Virginia. There they took apart the Union supply depot. After eating their fill of consuming Union food they seized at the supply depot. A Rebel lieutenant wrote, "To see a starving man eating lobster salad and drinking Rhine wine, bare-footed and in tatters, was curious."

We call the following recipe "Loviel Lobster Salad."

**Ingredients:**
4 cups cooked lobster, chopped
2 cups celery, chopped
1/4 cup green or red peppers, chopped
3/4 cup mayonnaise
2 tablespoons sour cream
1 tablespoon Dijon or regular mustard
2 tablespoons lemon juice
1/2 teaspoon salt
1/8 teaspoon pepper
Lettuce

**Instructions:**
1. Combine all ingredients.

2. Serve chilled.





A United States Marine heating his canned C-Ration meal on a stove fire. Many soldiers used to use C-4, a flammable plastic explosive, to rapidly heat cans of ham, scrambled eggs or meatballs. The C-4 has been replaced by technology; today's high-tech rations are self-heating.



Marine recruits at the former Marine Corps Recruit Depot, Parris Island, South Carolina, in the late 1970's. Today on Parris Island, such chow lines have been replaced by salad bars and almost eleven dining facilities. Yet the old standby — chipped beef on toast known as S.O.S. — still served and remembered with fondness by many Marine veterans.

Korean War. The canned ham-and-eggs had turned a bit green but a liberal dose of Tabasco covered up this questionable look.

America developed food that is both hated and loved. No nation on American military cuisine, would be complete without mentioning Spam, the mainstay of World War II. Spam, developed by World War I army veteran Jay Hormel, is a contraction of the words spice and ham. It is still made, with considerable success, by Hormel Food Corporation in Austin, Minnesota. While no longer official issue in the military, check the packs of soldiers and you are likely to find a can or two of Spam.

Complete K-Rations and C-Rations were served to fighting forces until the late 1970s when MREs made their appearance (based in part on technology developed by NASA for the space program). Processed cheese, powdered milk and freeze-dried coffee that were first invented for the government are now sold in supermarkets throughout the United States.

The general thinking has always been that the less said about U.S. combat rations, the better. No matter which ones — the hard tack of Civil War days, the K-rations, the C-rations and now the MREs — their reputation has never been great. Many combat soldiers will claim that the desire to consume rations increases with the distance from the front lines. Early MREs had a horrible reputation. One Marine called smoky frankfurters "the four fingers of death." Other descriptions are unprintable.

The value of U.S. rations as "trading goods" is low. In uncommon peace keeping missions and joint operations with allies, U.S. soldiers try, often in vain, to trade their rations with the rations of their allies, which perceived as superior.

A U.S. Army installation in Natick, Connecticut houses the lab of future military food. It is there that scientists (we dread to call them chefs) create unusual MRE items for the future such as oriental chicken with Thai sauce, seafood jambalaya and decent pasta. During the

preparations of this book, the food stylist Harry McMann, a most accomplished chef himself, pronounced the MRE rations as tasty and well prepared. Actually, once removed from the olive drab pouches and served on proper china, this food is superb.

Technically this mealtime can system — once worn by meal kits on their day legs — is known as the "P.M." At least that is the term used in the U.S. Army. The U.S. Marine Corps, with its flair for distinction, used to call it a "John Wayne." This can opener used to be essential field gear to open food stowed in WWII, Korea, and Vietnam. These K-and C-Rations have been replaced by MRE, packaged in a plastic pouch that do not require can openers. That can opener is a marvelous design, since it is self-sharpening and extra easy to use.

Will superb food emerge from U.S. military kitchens? Yes, if chefs already. Senior generals and admirals now favor their chefs assemble dinners equal to or better than the grandest restaurants around the nation. Valley Trote Crux were one featured item at one dinner of the Superintendent of the United States Military Academy in West Point.

Annual culinary competitions in the armed forces show the army of talent within the military. It is impressive and it is no wonder that former military cooks end up with great careers in the competitive commercial restaurant scene. A prime modern example is former Marine John Besh who served with distinction in the first Gulf War. While in Marine Corps service he kept a detailed diary of dishes he wanted to cook once back in civilian life. With that diary and a strong drive, as only the Marine Corps can supply, Besh ending up running award-winning restaurants in his native New Orleans.



During wartime exercises in Northern Germany these Marines spent hours waiting, hanging out on their tank. With a helmet on a barrel for a head, a nearby pretzel field provided the raw material for a revolting meal. The soldiers were quickly revived and put to bed after a bite. We need the C-Rations we served there or greater and stored this wonderful piece of home time with additional cheese. However stuns with real pepper, it was different.

This terrible war created a revolution in food with dehydrated milk being just one of the accomplishments. Very much like the Roman's, the Quartermaster Corps of the United States Army emerged as a major force, providing superb logistics and a steady supply of food. Not necessarily tasty food, but food nonetheless.

The United States has probably done more than any other nation to develop food that can be packaged safely and eaten years later. Co-author Agostino von Hassell recalls eating C-rations in 1973 that dated from the

what the U.S. stood for on the barrels of meat and jokingly one of Sam's workers replied that it stood for Uncle Sam. From that day on the story spread to everywhere Sam's meat was shipped and the initials U.S. were understood to be the identity of Uncle Sam Wilson. Ironically, as the Army began identifying everything from blankets to rifles with the initials U.S., they came to be known as Uncle Sam.

Samuel Wilson died in 1854 at the age of 88. Little did he know, at the time of his death that the world become associated with the nation's namesake, Uncle Sam.

Uncle Sam is buried in Oakwood Cemetery in Troy, New York.

Uncle Sam isn't alone in his culinary tribute to the United States. On February 20, 1991, The New York Times wrote of Tom Miner's determination to honor the General. Miner was the executive chef at Fraunces Tavern Restaurant at 54 Pearl Street in Lower Manhattan and he was interested in recreating the dinner that General Washington and his officers enjoyed at the tavern in celebration of the ousting of the British in 1783.

Fraunces Tavern was originally the Queens Head Tavern when it began serving in 1763. The proprietor and superb chef was Samuel Francis, who later changed his name to Fraunces. Born in the French West Indies, Fraunces is reputed to have been an avid anti-Royalist and arranged for clandestine meetings of groups like the Sons of the American Revolution and The Vigilance Committee, who in 1774 used the Tavern to protest the tea tax and the landing of British tea. It was New York's response to the Boston Tea Party. The Times reports that a verse written by Philip Freneau documents how Fraunces was unduly punished.

*Starve a braeside was ended*
*Till another began—*
*By Jove! It was nothing but*
*Poor ours Fraunequn!*
*At first we supposed it*
*Was only a sham,*
*'Til he drew a conclusion*
*Stop the roof of Black Sam.*

Fraunces was rewarded after the war when General Washington chose his tavern for a meal following a victory march down Broadway on British Evacuation Day in 1783. According to reports, the 1801 or so officers accompanying General Washington consumed an exorbitant amount of alcoholic punch and spruce beer along with 133 bottles of Madeira, port and claret. Mr. Miner went to great lengths to recreate the famed feast.

## A New Nation and New Culinary Skills

New culinary skills may be a stretch because early immigrants to America brought their own culinary skills with them. But it didn't take long for Yankee ingenuity to develop new and efficient ways to supply the new nation with food. And if it came from military leaders. There are two many stories in tell, but one instance is often told and well preserved at the Millwood Mill in Clarke County, Virginia – in an area where being called a Yankee is somewhat of an insult.

Brigadier General Daniel Morgan is credited for doing more to turn the tides of battle for the colonists than any other, aside from General Washington. Credited as the innovator of precision shooting for the infantry, which typically shot haphazardly in the direction of the enemy, General Morgan began using new tactics of war in 1777 by having his riflemen concentrate their fire on British officers, leaving the enemy troops leaderless. The British were furious, but his tactics led to the new country's victory at Saratoga, which prevented the Red Coats from splitting the colonists and gaining control of the Hudson Valley.



World War II brought some rationing to the United States even though the heavy action were nintendo overseas in countries such as Britain or Germany. Yet home canning — as in this 1945 "Victory Book" — was encouraged as an essential contribution to the war effort.

Contemporary records from the Revolutionary War strongly suggest that General Morgan loved his food and also made a major effort to maintain decent rations for his men. General Morgan, whose personal cooking pots and pans are now on display in Millwood, Virginia, built a farm called Saratoga (named after one of his victories) close to Millwood, right after the war. The photograph showing spoon bread and lamb stuffed with oysters was prepared using General Morgan's personal cooking utensils.

Thomas Jefferson considered Colonel Nathaniel Burwell to be the ablest businessman in Virginia. Burwell was charged with developing the Village at Millwood from 1785 to 1800 in what has been characterized as the one of America's most illuminating and absorbing post-Revolutionary histories of the nation.

Under orders from President Thomas Jefferson, Col. Burwell visited Millwood and reckoned that Virginia could not develop an economy solely on tobacco but needed crops that could be turned over more quickly. Burwell foresaw that establishing a grist mill to process corn and wheat would create opportunities for an agrarian economy in the region. General Morgan was interested in pursuing the endeavor with Burwell and he agreed to provide 580 Hessians to work at the mill. The German Hessians, now free, constructed the Millwood Mill in 1782 (completed in 1785) on Col. Burwell's property. The mill became a hub for numerous other commercial endeavors including a general store, tannery, blacksmith, a wagoner, two distilleries, a tavern and a post office. Millwood would become a model for many post-Revolutionary War villages in America minited by military leaders and located on the economic opportunities afforded by a mill.

The Millwood Mill, by the way, has been restored and remains one of the finest examples of Revolutionary War-era flour manufacturing in America today. The mill was state-of-the-art when it was built, and is a true piece of industrial art in addition to preserving what we might call one of the first "food factories" in the United States.

Legend has it had a well-known Pennsylvania specialty, Pepper Pot, originated with George Washington at Valley Forge.

During that brutal winter of 1777-1778 the troops were cold, ragged, and half-starved. To boost morale, General Washington is supposed to have ordered a good meal one night, only to learn all that was available was tripe, a few scraps, and peppercorns.

The cook did much with little and created a soup he named, after his hometown, Philadelphia Pepper Pot. At least that it the story told in the Delaware Valley where the dish remains a cold weather favorite. It is a historical fact that troops in snow-swept Valley Forge were served this dish, but it may have originated in Africa, making its way into United States through the West Indies. In the African recipe, fish, not tripe, was the focus of the soup.

General Ulysses S. Grant, fond of both food and spirits, served an ultra fancy dinner in New York, in 1880, at the Hotel Brunswick. Prepared for just ten guests, Grant was served:

*Soup. Consommé Royal.*

*Fish:*
*Fried smelts, sauce Tartare.*

*Releves:*
*Barrel capon.*

*Vegetables:*
*Cauliflower, Spinach, Artichokes, French peas*

*Dessert:*
*Biscuits Diplomatiques, Frozen pudding,*
*Meringue Chantilly, Assorted cakes*
*Fruit, Coffee, Cigars,*
*Liquers.*

During the War Between the States, Grant didn't hungry. The Yankees, unlike the Rebels, had enough food supplies. It appears Grant ate well. "I will move my army without onions!" General Ulysses Grant declared in an 1864 advisory to the federal government. It is a stark contrast to General Robert E. Lee's comment, "I have been up to see the Congress and they do not seem to be able to do anything except get peanuts and chew tobacco, while my army is starving...." One of Lee's colonels stated in 1863, "I cannot fight much until I get something to cook in!" The onions that Grant demanded the was immediately tent three train cars full of the tasty bulbs) were appreciated by soldiers both their flavor and antiseptic properties when used to treat powder burns.



# The New Empire
# U.S. Military Food

By Agostino von Hassell and Herm Dillon

## "I Am Uncle Sam:"

am Wilson was born on September 13, 1766, a decade before the American Revolution in a place known as Menotomy, which is now called Arlington, Massachusetts. His parents were colonists, so fully committed to the fight against British tyranny that they sent their two eldest sons to fight in General Washington's army.

When Sam was fourteen years old, his family moved to Mason, New Hampshire where he later met the daughter of Captain Benjamin Mann. The two fell in love. Before he could marry, however, Sam knew he would have to provide for Betsey Mann in the fine manner to which she was accustomed as the daughter of a senior army officer. With little enterprise available in Mason, Sam and his elder brother Ebenezer devised a scheme to move where they could find work and save some money. Sam was 22-years old when he left Mason. The brothers reportedly walking 150 miles through deep snow to the town known then as Vanderheyden, now Troy, New York near the State's capital of Albany.

Initially, Sam and Ebenezer became brick makers and later meatpackers. They both worked tirelessly and after having saved some money and establishing himself, Sam returned to Mason to fetch Betsey and marry her. The two were married in January 1797 and returned to Troy. They had four children, although only two survived to adulthood.

In Troy, Sam's meatpacking business began to thrive. He made his own barrels for packaging meat, and had his own docks and ships that distributed his products along the Hudson River and down to New York City.

At the outset of the War of 1812, Sam was asked to supply meat for the American forces serving in the northern suites. His reputation garnered such a high level of respect he was subsequently asked to become the inspector for beef and pork for the United States Army.

One day, in a patriotic move, Sam began painting the initials U.S. for United States on his barrel of meat. At the time, the initials were rarely used to identify the country, which was more popularly known as the United States of America. On a shipment north one day, someone asked

## Much More than Spam

I love my Canned Bill, I never knew
How good that stuff could taste in stew.
I dug it too, I love it cold
Cap'nWillie never will grow old.

If you walked into the kitchen
When they your morning drill,
You could bet your old "Fat Derby"
There would meet your friend "Corn Bill"

It's the thing that licked the Kaiser
In that land across the sea,—
And it always drove our troubles.
As we fought for Liberty.

—Bill's was our inspirations,
And we packed the stuff for miles.
It was always worth the effort,
As it filled our face with smiles.

He fought thru all the battles,
Just the same as you and he.—
And I don't see what ever keeps them.
From crying "Bill" a D.S.C.

By Buck Private McCahan

The New Empire, von Hassell, from Much More Than Spam: Military Food

Elegant Food Products and Recipes
University Press of the South, Inc.
5500 Prytania St. #418 417 New Orleans, LA 70115-USA
www.vonPressofthesouth.com

www.wwwpostcard.com

## THE WALL STREET JOURNAL.

# BOOKS

GASTRO



## Military High Life

By Agostino von Hassell, et al.
*University Press of the South,*
*162 pages, $34.95*

This sumptuously produced but unevenly researched coffee-table volume offers a lesson to eaters and editors alike: Even the choicest ingredients can be ruined by clumsy handling. Intended as a wide-ranging tour of field kitchens and officers' messes through the ages, "Military High Life" includes 141 beautiful color illustrations and 73 interesting recipes. Unfortunately the accompanying text and captions don't always measure up. Victorian hussars are identified as Napoleonic Prussians are mistaken for Russians; London's Cavalry Club is uprooted from No. 127 at the far end of Piccadilly to Piccadilly Circus many blocks away; and a cellarer anecdote about Napoleon's fastidiated district's sometimes chancellor, Jean-Jacques ... is misattributed to a nonexistent "siege ... Concerns." Elsewhere, British ...

...



**Military High Life – Elegant Food Histo-ries and Recipes**, *created by Agostino von Hassel, Herm Dillon & Leslie Jean-Bart, published by University Press of the South, ISBN 1-931948-60-7, hardcover, $34.95 (US).*



No, the title is of this book not a contradiction of terms. This is a beautifully produced and lavishly illus-trated history of military food from Egyptian times to the present and is an engrossing historical and cultural read - as well as a working reference book com-plete with contemporary and modernized centuries-old recipes.

Military food has had a tremendous impact on global culinary culture. Many wars were fought over resources, food in particular. Invading armies would often return with new food ideas, new spices and new ingredients. This book confirms the importance that fine dining, spirits and wines have had on centuries of mili-tary influence, entertainment and at times coercion.

A unique addition to the world of culi-nary literature, this book is a must-have for any afficionado of both military histo-ry and fine dining.

Vic Johnson

# Sunday book event includes lecture on military cuisine

A reception, lecture and book signing in honor of Agostino von Hassell, author of *Military High Life*, will be held at 1 p.m. on Sunday, April 1, at The Country Inn.

The new book tells the story of the unique culinary journey of the world's military forces through history. The event is sponsored by the Written Word and Bath Bookworks of Berkeley Springs.

Von Hassell is the husband of Berkeley Springs native Elizabeth Harrnison.

Born in 1953 as Christian Augustin, he grew up in Rome (where he was called Agostino); Brussels, Belgium, and Bonn, West Germany. His father, a diplomat for the new Germany, retired in New York City after serving as German ambassador to the United Nations.

Receiving a Bachelor of Arts degree from Columbia University and a graduate degree from the Columbia School of Journalism, von Hassell began a career as a photojournalist. He has worked for various new services and publications, including Reuters, *Newsweek*, *Boston Globe*, *The Charlotte Observer*, *Paris Match*, *Interview* (Spain), *Gente* (Italy), and West German television. He heads a consulting group in New York engaged in national security issues and trade problems.

His recent book *Alliance of Enemies* tells the story of the World War II relationship between Nazi Germany's espionage service, the Abwehr and the American OSS, predecessor of the CIA.

*Warriors: The United States Marines* was the first of his two illustrated books on the U.S. Marine Corps. He is a life member of the U.S. Marine Corps Combat Correspondents Assoc.

A portion of the proceeds of his books is given to the Marine Corps Law Enforcement Foundation for the education of children of U.S. soldiers killed in action.

He makes his home in New York City and Virginia.



## Chef James' Interview with Agostino von Hassell
### Author of Military High Life: Elegant Food Histories & Recipes

(January, 2007)

**Chef James:** Mr. von Hassell, do you do much cooking yourself? Did you cook while growing up?

**Agostino von Hassell:** I do cook very frequently, often composing complex menus that draw on history as well as fresh seasonal products for small and large groups. It is routine in my house to have elegant dinners for 30 or 40 people. I grew up in a diplomatic household: that environment is s close to a restaurant considering the amount of official entertaining required. This exposed me to food and dinners from an early age. As young as 8 years old I would serve at formal dinners along with the domestics to learn those skills.

**Chef James:** There seems to be an increasing interest in 'food history' in the U.S. If you agree, why do you think this is so?

**Agostino von Hassell:** The field of "food anthropology" has literally exploded. A trickle of food history books has turned into a stream. The main reason is that people rightfully question where food comes from and what is special. I also sense a rebellion against mass-produced food (hence the boom in farmers' markets) as well as a desire to explore traditional dishes. Food should be a major interest: the average person consumes over 85,000 meals in a life time.

**Chef James:** When in prolonged periods of combat situations, having sufficient

food is a major concern, but does the variety and quality of the food also affect morale to any extent?

**Agostino von Hassell:** In any type of combat – brief or prolonged – food is a major morale booster. U.S. infantry units – U.S. Marines or soldiers – can count on their quartermasters to do everything possible to somehow bring out to the field hot meals when possible. Those cooks are amazing and full of courage. Care packages sent from home with "treats" are important also. Throughout history military leaders have recognized that food helps with the spirit. Yet there are times when resupply is impossible and you just make do: it is then you create "virtual" meals in discussions with your buddies as in: "Imagine a chicken…."

**Chef James:** How have various military forces handled dietary restrictions (vegetarian, religious restrictions, etc)? Have these ever had a noticeable effect in any conflicts?

**Agostino von Hassell:** In history – i.e. prior to 1800 – dietary restrictions were of little import. Since then – i.e. the British forces in India, U.S. forces in the Middle East – quartermasters have taken great care to meet local needs. U.S. rations often avoid pork products (for Muslim countries) and even offer all-vegetarian options. Again, combat can quickly limit these choices.

**Chef James:** What are some of your most unexpected discoveries in your research for Military High Life?

**Agostino von Hassell:**
• That the United States has such a rich history of good military food
• How Britain has adopted tastes, flavors and spices from its former colonial empire: a chicken curry served to me aboard the HMS Fearless in the Mediterranean was the best curry ever – even when compared to top-ranked

Indian restaurants in London.

**Chef James:** Is there an amusing discovery you could share with us?

**Agostino von Hassell:** It may not be all that "amusing" yet inspiring how Marines in combat end up combining all their rations (no matter what they are...meat, hot dogs, beans, jerky, cheese) into one large pot, heat it up and season it with plenty of Tabasco sauce. Or how you improve the horrible coffee in rations by adding coco powder.

**Chef James:** What foods, if any, did you miss most during your own military service?

**Agostino von Hassell:**
• Fresh lettuce
• Good Mustard
• Olive Oil

**Chef James:** What foods did you enjoy the most during your own military service?

**Agostino von Hassell:**
• In the field: superb canned tuna packed in olive oil (easy to carry)
• Chocolate chip cookies freshly baked aboard ship
• Arborio rice served with some salt and butter aboard an Italian warship
• Good red wine from Italian and French rations

**Chef James:** When at home, what do you like to eat?

**Agostino von Hassell:** I try to be as seasonal as possible and get the best from the land when the time is right. I will never touch tomatoes when not in season;